In the Matter of the Estate of Daniel Waszkiewicz, Deceased.

**Gen. No. 11,706.**

Second District, First Division.

May 23, 1963.

Rehearing denied July 9, 1963.

Seymour Velk and Sherwin J. Malkin, of Chicago, for appellant.

Vernon R. Forgue, of Maywood, and Francis G. Higgins, of Wonder Lake, for appellees.

DOVE, J.

Daniel Waszkiewicz died intestate on January 24, 1962. On February 1, 1962, John A. Siwek, filed his verified petition in the County Court of McHenry County in which he alleged that he was the son and

sole heir of Daniel Waszkiewicz, deceased and prayed for the issuance, to him, of letters of administration. On the same day February 1, 1962, Katherine Waszkiewicz filed her petition in the same court, to be appointed administrator in this estate, her petition averring that she was widow of Daniel Waszkiewicz and that his only heirs were petitioner, Katherine Waszkiewicz, and Frances Kowell and Stella Barton, his nieces. February 15, 1962 Frances Kowell filed her petition in the same court for letters of administration in this estate, in which she alleged that the heirs of the decedent were herself, Stella Barton and Afansy Waszkiewicz, all allegedly first cousins of the deceased.

Following a hearing in the County Court an order was entered finding that John A. Siwek was not the son or heir of decedent, Daniel Waszkiewicz, and was not entitled, under the laws of Illinois, to inherit any part of decedent's estate. The order dismissed the petition of John A. Siwek at his costs and he appeals.

At the hearing, Caroline Siwek testified that she was born in Cicero, Illinois on March 8, 1908; that her maiden name was Grouszek and in 1924 she was living in Bellwood, Illinois, at the home of her mother and stepfather, Albert Sowa; that in addition to her mother and stepfather the family consisted of two brothers, one sister and herself; that at that time her stepfather, Albert Sowa, was employed by the Northwestern Railroad Company as was also decedent, Daniel Waszkiewicz; that decedent had boarded with the Sowa family and occupied a room in the attic of the Sowa home for more than four years, during which time, she, Caroline Siwek, cleaned his room every Friday and Saturday.

This witness, Caroline Siwek, further testified that she did not recall the month when she first had sexual intercourse with decedent, but it was in the home

of her parents in June or July, 1924, and thereafter had intercourse with him "quite a few times," and, as a result thereof, became pregnant; that she told her parents of her condition and when she did so her stepfather "got after Daniel Waszkiewicz and he moved out." She further testified that her son, John A. Siwek, was born June 11, 1925 at the home of Joseph Wright, in Maywood, where she was employed as a housemaid; that she remained in the Wright home for a week after her baby was born and then Mr. Wright brought her to the home of her mother and stepfather; that decedent came to see her there and she said to him at that time: "Here I'm a mother. Look what you did to me"; that decedent replied: "You don't have to worry, I will marry you"; that on November 14, 1925, she was married to decedent in the Catholic Church in Hillside and on the following day appellant was baptized in that church by its pastor, Father Griffin; that upon this occasion, referring to appellant, decedent said to Father Griffin: "This is my son and I want him baptized"; that Father Griffin didn't reply but said a prayer and baptized the baby. "I don't remember just what he did or what he said," continued the witness, "as I don't understand Latin. He asked me the father's name and my name and what the baby is to be named. I gave that information to the priest ahead of time."

Mrs. Siwek further testified that after her marriage to decedent and after the baptism of appellant, she and decedent lived together at the home of her mother for a little over a year, during which time decedent supported her and appellant, supplied clothing and medical care for them, and together they visited relatives and friends, to whom, in referring to witness and appellant, decedent said, "This is my wife and this is my baby."

51

Mrs. Siwek further testified that she, decedent, and appellant left the home of her mother about one year after their marriage and moved to Milwaukee, where they lived together as a family. They remained in Milwaukee a short time and returned to Chicago and lived at various places in Chicago until they separated in December, 1932; that from 1929 until 1940 she operated a Beauty Shop in Chicago and was operating her Beauty Shop when she procured a divorce from decedent on April 26, 1933 and thereafter married her present husband, Thomas Siwek, on November 5, 1933.

Joseph Wright was called as a witness on behalf of appellees and he testified that he was Vice-President and General Counsel of the Illinois Central Railroad, and was admitted to the bar in Illinois in 1919; that on June 11, 1925 he lived on Oak Street in Maywood and occupied the position of Judge or Magistrate in Maywood at that time; that he could not say he knew Caroline Grouszek and no one of that name ever lived at his home, and no child was born in his home on June 11, 1925. This witness further testified that at this time, June 11, 1925, his mother lived on Fifth Avenue in Maywood, which was just around the corner from where he lived; that his mother had at that time, in her employ a girl by the name of Caroline whose primary duties were to take care of a paralyzed sister; that Caroline was a domestic, and while working for his mother gave birth to a child at his mother's home and that the birth of this child was the occasion of considerable discussion in the family circle as none of the family knew Caroline was pregnant.

Mrs. Bartosiewicz testified that she knew Caroline Grouszek and had known Daniel Waszkiewicz for five or six years before he and Caroline Grouszek were married; that she was invited to, and attended their marriage on Saturday, November 14, 1925 and acted as Godmother and sponsor to appellant when he was

52

baptized at St. Simons Catholic Church in Bellwood on November 15, 1925; that she so acted as sponsor and Godmother because she was requested so to do by decedent; that at the baptism, the pastor of the church asked decedent whether he was the father of the child who was being baptized and decedent said he was and that Caroline, at that time, said she was the mother of the child; that following the baptismal ceremony, witness attended a reception at the home of Josephine Sowa, who was Caroline's mother; that decedent was present and introduced Caroline to the guests as his wife, and referred to appellant as his son. This witness further testified that thereafter decedent and Caroline lived together as man and wife; that appellant lived with them and when he went to school, he was registered in school as Johnny Waszkiewicz; that they continued to live together as a family until appellant was five or six years old, at which time they separated and that until the time of their separation this witness saw them at least once a month.

Nettie Smith testified that she was a cousin of the mother of appellant; that she knew decedent when he was a "boarder" in the Sowa Home, and that she was at the Sowa home when appellant was five days old; that at this time Caroline was 16 years of age and decedent about 30; that upon this occasion decedent entered the bedroom where Caroline was in bed with her baby; that decedent there kissed the mother, Caroline, and the baby, and stated that Caroline was going to be his wife; that the witness then suggested to decedent that he "was too old for her, (Caroline)," whereupon decedent said, "No, this is my son and I'm going to take care of him, and I'm going to marry her."

Helen Zelasko testified that in 1931 or 1932 she was about thirteen years of age and that she lived at the home of decedent and her cousin Caroline Waszkiewicz "on a twenty-four hour basis" during the entire summer of 1932; that witness ate her meals with decedent,

his wife, Caroline, and appellant; that they went on picnics and to Mass together; that decedent referred to appellant as "his son Johnny" and appellant called decedent "Daddy."

Charlotte Kukla testified that she was not related to decedent but that her daughter, Arlene, is the wife of appellant; that on June 23, 1951, her daughter, Arlene, and appellant were married and on the evening of that day she attended a wedding reception which took place at Ann's restaurant on Cermak Road; that there were more than one hundred guests present; that decedent was there and sat at the table with appellant and his bride and with the witness and her husband; that decedent was introduced to the witness and her husband by appellant, and during the conversation which followed he said that he was glad to meet us and that he thought "my daughter was a wonderful woman."

Appellant testified that decedent and his mother were married at St. Simons Catholic Church in Hillsdale, Illinois on November 14, 1925; that the earliest recollection he had of decedent was when the witness was about five or six years of age, at which time decedent and the mother of the witness and another lady lived at a home on Girard Street in Chicago; that while living there his mother left decedent and moved to a home on Twenty-first and Fairfield Streets; that he went with his mother but was too young to know what happened to decedent; that he enrolled in school in September 1932 under the name of John Waszkiewicz and his mother gave her name on the school application as Caroline Waszkiewicz; that while he lived with his mother and decedent on Girard Street, he saw Daniel Waszkiewicz every day but when he and his mother moved from there to the Fairfield address, he did not see him until the year 1940; that when he did see decedent in 1940, decedent was in the County

54

Hospital for a hernia operation; that he next saw decedent in 1946, following his discharge from military service on March 31st of that year; that after the year 1946, he kept in contact with decedent and saw him three or four times a year and visited him occasionally at his home and he was invited to the family functions.

Appellant further testified that while decedent, appellant's mother, and himself were living together at their first floor apartment on Girard Street, the family had their meals together; that there were two bedrooms in the apartment and that decedent and his mother occupied one bedroom and he occupied the other; that decedent operated a barber shop in their home and he recalled being in the barber shop and heard decedent say to some of his customers, both in Polish and in English, "This is my son Johnny."

Appellant further testified that when he was 26 years of age, he was married; that decedent was an invited guest and attended the wedding and the wedding reception which followed at Ann's Restaurant; that at this reception appellant introduced decedent to the guests who were present as his father and that decedent stated to some of the guests that he was the father of appellant; that there was a special table for the bride and groom and their families, and that decedent and appellant's mother and stepfather, Thomas Siwek sat at this special table, with other members of the immediate family; that upon this occasion decedent stated that it was about time for appellant to marry; that he was happy appellant was getting married and that he was "anxious for grandchildren." Appellant further testified that thereafter, appellant visited his father every two of three months while his father lived in Chicago, and that after appellant's first child was born, decedent asked him what he was going to name the baby and he told him "Daniel";

that he did name him Daniel Thomas Siwek, and at the time of the hearing Daniel Thomas Siwek was 10 years of age.

A certified copy of the marriage license issued by the County Clerk of Cook County on November 6, 1925, authorizing the solemnization of a marriage between decedent and Miss Caroline Grouszek, and the certification thereon stating that decedent and Caroline Grouszek were united in marriage on November 14, 1925, was offered and admitted in evidence by stipulation of the parties.

A certified copy of a certificate of birth was also admitted in evidence, by stipulation of the parties. This certificate recites that Junior Grouszek, a male child, was born on June 11, 1925; that his mother's name was Caroline Grouszek, whose post office address was Bellwood, Illinois, and that her age, at her last birthday, was sixteen years. Under the printed name "Father," appears the name "Paul Kuc," and after the printed word "Address," the words, "not known" are written.

The record further discloses that on December 12, 1932, Caroline Waszkiewicz, appellant's mother, verified a complaint for divorce which was subsequently filed in the Superior Court of Cook County. In this complaint she averred that she and decedent were married on November 14, 1925, and that she lived with her husband, as his wife since said marriage and until the date of the filing of her complaint for divorce. The complaint was in the usual form and alleged that "no children were born as a result of this marriage to defendant." It was further alleged that since the day of her marriage she has always been employed and earned her own living, and turned over all her earnings to the defendant, but that the defendant failed to support her, has never given her any money, but has abused and ill-treated her at every opportunity.

56

In this divorce proceeding, the defendant entered his appearance but filed no answer, and he was defaulted. The cause was heard, and on April 26, 1933 a decree of divorce was entered which recited that plaintiff had waived her right to alimony, court costs, support money, and attorney fees. The decree granted her "the right to resume her maiden name of Caroline Grouszek."

A transcript of her testimony taken at the divorce hearing, discloses that the plaintiff, in response to the question, "Any children born of this marriage?" answered, "No."

The foregoing is a fair resume of the evidence found in this record. The trial court in disposing of the case, stated: "There is no dispute as to the fact that Daniel Waszkiewicz and Caroline Grouszek did in fact marry in 1925. There is also evidence from several witnesses to the effect that Daniel Waszkiewicz did, at various times, acknowledge petitioner, John A. Siwek, as his son. It is, however, the court's opinion that before either the marriage or the acknowledgment could have any effect, the court must first be convinced that Daniel Waszkiewicz was, in fact, the father of petitioner, John A. Siwek. It is on this point the court finds that the petitioner fails in his proof." The trial court then referred to the birth certificate which disclosed that the father of appellant was Paul Kuc, and stated that this information must have been furnished by someone who had knowledge of Paul Kuc. The court also commented on the fact that decedent was represented by counsel in the divorce proceeding and that it was unusual for a father not to seek some provision in the decree for the right to visit his son, and it was equally unusual for the mother of appellant to wish to assume her maiden name. The court then concluded: "Although there is oral testimony to the fact that Daniel Waszkiewicz acknowledged John A. Siwek as his son, all the docu-

mentary evidence in the case indicates that John A. Siwek was not the son of Daniel Waszkiewicz."

What this record discloses is that in 1924, appellant's mother, Caroline Grouszek, was fifteen or sixteen years of age and was living with her mother and stepfather, Albert Sowa; that decedent, then thirty years of age had an upstairs room and took his meals at the Sowa home; that during this time Caroline conceived appellant; that thereafter she worked as a domestic in the home of the mother of Joseph Wright, and while there, on June 11, 1925, appellant was born; that a week or so thereafter Caroline returned to the home of her parents and decedent was informed of the birth of her baby, and was told that he was appellant's father; that he then said he would marry Caroline and on November 14, 1925, decedent and Caroline were married and on the following day appellant was baptized; that from November 14, 1925 until December 13, 1932, decedent and Caroline lived and cohabited as man and wife; that during these seven years, appellant was a member of this family, and his home was the home of decedent and appellant's mother; that on December 13, 1932, Caroline, the wife, left decedent and the home where they were living, took her child, then seven years old, and filed her complaint for divorce; that on April 26, 1933, a decree was granted the plaintiff, divorcing her from decedent on the ground of adultery; that thereafter appellant's mother, on November 5, 1933, married Thomas Siwek, and appellant assumed that name; that appellant attended and graduated from school, entered the Air Force of the United States, and upon his discharge from Military Service in 1946, saw his father at infrequent intervals; that he was married on June 23, 1951, and at his wedding and the reception which followed, decedent was present and treated as a member of the immediate family of the groom. At that wedding,

which took place more than ten years before decedent's death, he recognized and acknowledged appellant as his son, as he had done on numerous occasions, beginning when appellant was one week old, and continuing until the time of his death. The record does not disclose that he, at any time, denied he was appellant's father, and it is not suggested nor is there any evidence in this record that, prior to the birth of appellant, his mother ever had sexual intercourse with anyone other than decedent, and the only evidence in the record is that the only person appellant's mother ever had sexual relations with, prior to her divorce in 1933, was decedent.

Counsel for appellees state that under the authorities appellant was required to prove that (a) decedent was his father, (b) decedent married his mother, subsequent to his birth, and, (c) decedent acknowledged appellant as his son. The trial court found that the evidence discloses that decedent married appellant's mother subsequent to appellant's birth, and that decedent acknowledged appellant as his son. The record shows that appellant testified that he was the son of decedent and that his mother testified that decedent was the father of appellant. Counsel insist, however, that the documentary evidence offered upon the hearing is of far greater credibility than the testimony of these witnesses; that appellant and his mother are not disinterested witnesses, and that the evidence of the mother was incredible and not worthy of belief.

Counsel direct our attention, in support of this contention, to the allegations of the verified complaint for divorce filed by appellant's mother. One of these allegations is, "that no children were born as a result of this marriage," and another, that decedent never gave the mother of appellant any money while they were married, and that he failed and refused to sup-

59

port her. Our attention is also called to her evidence at the divorce hearing, where she was asked: "Any children born of this marriage?" to which she replied: "No"; that she was also asked, upon the divorce hearing: "Do you want to resume your maiden name?" and she replied in the affirmative. Our attention is also called to the certificate of birth which states that Paul Kuc was the name of appellant's father.

Of course, appellant and his mother are interested witnesses in the sense that appellant would benefit financially if he is found to be the son of decedent. It is true that the testimony of appellant's mother, Caroline Siwek, in the instant case, was at variance with some of the allegations of her complaint for divorce and with some of her testimony in her divorce proceeding and it may seem strange that she wanted to resume her maiden name. Less than seven months after she resumed her maiden name, however, she married. The certificate of birth does recite that Paul Kuc is the father of appellant, but it does not appear that the mother of appellant gave that information to Dr. Reynolds, who attended appellant's mother when appellant was born.

Granting, however, that it is unusual for a mother with a child to desire to resume her maiden name and granting that at the hearing of her complaint for divorce from decedent, appellant's mother testified that no child was born of her marriage to decedent, and granting that the name of Paul Kuc appears on the birth certificate of appellant, these facts should not, in view of all the evidence found in this record, warrant the conclusion that decedent was not the father of appellant.

Miller v. Pennington, 218 Ill 220, 75 NE 919, cited and relied upon by appellant, was a proceeding brought by Betsy Pennington, Alexander Miller, and Rusaw Miller, for the assignment of dower and home-

stead to Betsy Pennington, and for partition of the lands of which Anthony Pennington died seized. The defendants answered admitting the death of Anthony Pennington, and that Anthony Pennington was seized of the described land and that Betsy Pennington was his widow. The answer denied, however, that Betsy's children, Alexander Miller and Rusaw Miller, were children and heirs of Anthony Pennington.

In the course of its opinion, after referring to the provisions of the Bastardy Act and to our Statute of Descent, in force at that time, the court said: (p 224), "The rights of the complainants, as heirs of Anthony Pennington, are to be determined under the latter statute, (Statute of Descent), and it was necessary for them to establish, by the proof, three facts: First, that Anthony Pennington and Betsy Miller were their parents; second, that their said parents intermarried; and third, that Anthony Pennington acknowledged them as his children. Each of those facts was clearly and indisputably shown by the evidence, and the conditions of the statute having been complied with, they are thereby declared to be legitimate. . . . All that the statute requires in respect to acknowledgment is that the father shall own or admit the child to be his, and the fact that Anthony Pennington very frequently acknowledged these children to be his is beyond dispute or controversy."

At the time the Pennington suit was decided, the applicable provision of our Statute of Descent provided: "An illegitimate child, whose parents have intermarried, and whose father has acknowledged him or her as his child, shall be considered legitimate." (Hurd Stat 1899, p 653.) Section 12 of our present Probate Act provides: "An illegitimate child, whose parents intermarry, and who is acknowledged by the father, as the father's child, shall be considered legitimate." (Ill Rev Stats 1961, c 3, art 2, § 12, sub-par 8.)

61

In Adger v. Ackerman, 115 Fed Rep 124, it appeared that Dr. Alfred W. Fleming left his wife in October, 1889, and was divorced from her on November 21, 1890. From October, 1889, until the Spring of 1893, he spent much of his time with Mary Quan, and after his wife procured a divorce from him in October, 1889, he lived with and supported Mary Quan, to whom a son was born on September 2, 1892. The certificate of the attending physician gave Alfred W. Fleming as the name of the child, "A. W." as the name of the father, and "Mamie" as the name of the mother. On September 11, 1892, Dr. Fleming had the child baptized and gave him his own name. On the Sunday following this christening the doctor gave a dinner in honor of the child, at which he presided, and where he received congratulations on the birth of his son. Thereafter, he manifested great affection for the boy and treated him as his son. On October 4, 1892, Dr. Fleming and Mary Quan applied for a marriage license in which they both stated that they were single and unmarried. They were married by a judge of an Illinois court and after the marriage ceremony they continued to live and cohabit together.

In its opinion the court stated that the case presented a single issue: "Is the defendant, Alfred W. Fleming, the legitimate son of Dr. Alfred W. Fleming, deceased?" The trial court had answered this question in the affirmative and the Circuit Court of Appeals affirmed. In its opinion the court set forth and commented upon the evidence, a large amount of which tended to prove that Dr. Fleming was incapable of producing children, from which, it was contended, Dr. Fleming could not have been the father of the boy, Alfred W. Fleming, and that his paternity must be attributed to some of the younger men who visited the apartments of his mother. In answer to this contention, the court said (p 134): "He, (Dr. Fleming)

was supporting, caring for, cohabiting with the mother of defendant, Alfred W. Fleming, and treating her as his wife for three years before this boy was born. If he was incapable of begetting a child, he knew it, and he knew that this boy was not his son. It is incredible that in such a situation he would attend the mother while she gave birth to the son of another, record himself as the father of this child in the registry of his baptism, bestow upon him his own name, recognize him as his son and his mother as his wife for six years and until he died. The only theory of this case that squares with writings, acts and the conduct of this man, and with the ordinary course of human action under similar circumstances, is that he believed himself to be, and that he was, the father of this boy."

In the concurring opinion in Adger v. Ackerman, Judge Thayer refers to the Missouri statute which declares: "If a man, having by a woman, a child, shall afterward intermarry with her and shall recognize such child to be his, it shall be legitimated," and then says, "This statute in my opinion, in effect makes the fact that a man recognizes a child, born out of wedlock, as his offspring, after he has married the mother, persuasive, if not conclusive, evidence that he is the father of such child. The question is pertinent, why did the legislature require recognition unless it was to be taken as evidence of paternity from one who was most liable to know the fact? It cannot be reasonably claimed that the legislature intended that recognition should have no probative force, as respects the question of paternity, and that this latter fact must be established otherwise than by recognition. No legislature would be apt to sanction such a doctrine, and if it had been the intention of the legislature to formulate that rule, nothing would have been said concerning recognition but the statute would have simply

declared that if a man has by a woman a child, and subsequently marries her, the child shall be deemed legitimate. Besides, the rule which denies that recognition has any probative force or only slight weight, as bearing on the question of paternity, would leave an illegitimate child in practically the same helpless condition which such children occupied before the statute was enacted, since it would frequently be impossible for a child to prove its paternity otherwise than by recognition."

The opinion then stated that the statute was intended primarily for the benefit of those who were so unfortunate as to be born out of wedlock, and who, for that reason, were made outcasts by the common law; that the words of the statute, "and shall recognize such child to be his," would have had no place in the statute "unless it had been intended that recognition should be regarded as the very highest evidence of paternity. I am of the opinion, therefore, that the legislature intended to give to acts of recognition the effect of evidence of a very decisive character, upon the theory that a man who marries a woman who has an illegitimate child is most interested in knowing, and is most liable to know, whether the offspring is his, and would not be prone to recognize it as his offspring unless it was his."

What our Probate Act provides is that "an illegitimate child whose parents intermarry and who is acknowledged by the father as the father's child shall be considered legitimate." (Ill Rev Stats 1961, c 3, art 2, § 12, sub-par 8.)

Here decedent married Caroline Grouszek, who was the mother of an illegitimate child. He was most interested in knowing whether her offspring was his, and he was the one most liable to know whether Caroline's child was his child. He satisfied himself that appellant was his child, and he married appellant's mother,

recognized that appellant was his son, and acknowledged him to be his son during a period of more than thirty-six years, during seven years of which period, he, appellant, and appellant's mother lived together as a family. By recognizing appellant as his child during this long period of time, under the facts and circumstances disclosed by this record, places appellant in as favorable a position, as if he had been born in wedlock.

The judgment of the County Court of McHenry County is reversed and this cause is remanded to that court for further proceedings consistent with this opinion.

Reversed and remanded with directions.

McNEAL, PJ and SMITH, J, concur.